Case number 22-18. Advanced Energy Economy et al. Petitioners versus Federal Energy Regulatory Commission. Ms. Fidler for the petitioners, Mr. Kennedy for the respondents, Mr. Fitzgerald for the interveners. Morning. Ms. Fidler? Am I pronouncing that correctly? Yes, you are. Good morning, your honors, and may it be so kind. My name is Danielle Fidler, and I'm here on behalf of petitioners. I'd like to reserve three minutes for rebuttal. Because this appeal involves so many claims and proceedings, we'd like to focus today on the three issues central to resolving all of them. First, like most agencies, the Federal Energy Regulatory Commission has straightforward rules on how to calculate statutory deadlines that expressly cover the required actions and time periods at issue. First, refusal to apply those rules to the request for a hearing of the deadlock order is unlawful and inequitable. Second, the court must correct the Commission's interpretation of Section 205G of the Federal FAR Act to clarify that whether writing for a majority or a tie, the duty to provide a reasoned rationale and make findings of fact rests solely with the commissioners and not the court. The failure of the commissioners to meet that duty here was arbitrary. Finally, even if the court has agreed with these points, it must still vacate FERC's approval of the Southeast Energy Exchange Markets Transmission Service, which is an unduly discriminatory power tool. FERC's findings to the contrary abandon its duty to prevent monopoly utilities from using their market power to shut out competitors and overcharge customers. Turning to the first point, petitioners' requests for a hearing of the deadlock order were timely filed in accordance with FERC's rules for two reasons. First, the utility's request of effective date caused the end of Section 205D required minimum 60-day notice period to fall on a weekend or holiday. By the way, if we agree with you about this, do we have to reach any of the tariff issues? Yes, Your Honor, both. Why? If the agreement's invalid or vacated, why do we have to reach the tariff issue? Aren't they all dependent on the agreement? They are two separate filings, Your Honor. Right, but would the tariff filings have occurred but for the agreement? It's true, Your Honor, that if the same agreement were invalidated, that would certainly make it more difficult to have the tariff go into effect. But they are, as they are separate orders, Your Honor, I think both orders have to be addressed. Right, but let me make sure I understand. If we invalidate or vacate the agreement, send it back, do the tariffs cease to be effective? Do the tariffs play any role at that point? Well, because the tariffs are still the tariffs at issue, that is the tariff in effect right now, they also have to be, the order for that also has to be invalidated. But I guess, I don't understand that, but I guess you, just see if I can understand your answer to Judge Cato's question. You don't believe that invalidating, assuming for the sake of argument that we agreed with any challenges to the same agreement, and in order to make it true, you don't believe that that connects to the needs to make sure of the tariff? Yes, Your Honor, I think that's correct. Petitioners have to point out, these are two separate files. Well, at least as a practical matter, it would be difficult to continue with the tariff if the same agreement itself is going, has been invalidated. As far as the operating tariffs are in effect currently with the Commission, both orders have to be invalidated. As a practical matter, if referred back to the Commission, they have the authority to do what's necessary and may themselves decide to implicate the tariff order. But as far as the procedure stands, both filings are in effect. If we agreed with you that the rehearing petition was timely, why shouldn't we remand to FERC to consider the rehearing petition? We've asked that it be vacated and sent back to... No, I understand that's what you've asked for, but why wouldn't the prudent thing to do be to remand for FERC to consider on the merits? I mean, we took a similar approach in a case called Dayton Power and Light, where the rehearing petition, FERC found it was untimely, the court thought it was timely, and then we remanded for FERC to consider it on the merits. Because that's the whole purpose of rehearing in this scheme, is to let the agency have an opportunity to consider these arguments on the merits in the first instance. Correct, Your Honor. And I'm sorry, did you just restate your question with regard to that item? So I'm saying why, if we agreed with you that the petition was timely, why wouldn't the appropriate remedy be simply to remand to FERC to consider the rehearing arguments on the merits? Well, two things, Your Honor. There are factual errors in the agreement itself that the commission has adopted as part of the rationale, one of them being that the agreement is bilateral. Those things could be considered on rehearing by FERC in the first instance. Correct, Your Honor. And yes, remand is appropriate for the commission to reconsider the agreement on the merits, Your Honor. I would posit that the tariff order has already addressed any of the commission's findings with that regard, and that's why, again, we ask that those orders be considered by the court, because many of the findings regarding the agreement, some of the core principles are before the court in the tariff order, specifically with regard to for example, whether or not this is an unduly discriminatory power pool. So I think just sending the agreement back would leave in place or send the commission back without direction on those substantive issues, which are properly before the court and are also based on error. Excuse me, if the agreement is invalidated, say why there's a power pool. I'm sorry, Your Honor, I didn't hear you. Why, if the agreement is invalidated, why is there a power pool, an illegal power pool? Isn't the illegality of the power pool tied up in the agreement? It is, Your Honor. I guess, Liz, my understanding of Judge Rao's question was, if one was sending the agreement back for reconsideration by the commission as the first order of business, the concern that petitioners have is that the commission's findings with regard to that question, Your Honor, about whether or not this is a power pool, are before the court now with regard to the tariff order. So I think, so petitioners would argue that that decision is also arbitrary and capricious and that information needs to be provided to the commission as it considers both the agreement and the tariff. And additionally, with regard to the agreement without further corrections in the court regarding how to review, given that the commission is once again at four members, that that instruction from the court is important to inform the court both of how to handle the review and also that the issues with regard to the substance of whether or not the power pool is unduly discriminatory also need to be provided as they reconsider the matter. Did I just hear you say that the commission is still at four members? It is back to four members, Your Honor. Are they the same four members that considered the, I guess, the same agreement in mid-2021, mid-late 2021? Chair Glick is no longer on the commission and Chair Phillips is now. So getting to the merits, assuming we find that the challenge, the request for rehearing was timely and that we have jurisdiction over the challenge, help me understand I guess with respect to the, and let's assume also just for the sake of this question, that we agree with how your construct, how we're supposed to review the deadlock. Help me understand why there was a failure to respond to the governance and membership structure and independence of senior leadership, some of those other points that you say you've raised. With regard to the agreement, Your Honor, with regard to the agreement, while we discuss this in great detail, I think some of those fundamental issues are that the governance, monitoring, and other requirements on the same agreement rest on the finding of the supporting commissioners that this is a bilateral agreement. But this is not a bilateral agreement. At each turn, the elements of the agreement come up in terms of whether or not this is a power pull, whether or not the terms are discriminatory, for example, the enabling agreements not being mandatory, but basically the unfettered discretion to allow people to participate. At each turn, supporting commissioners rely on that this is just an extension of a bilateral market. But this is not bilateral, and first own fundamental documents reflect that a bilateral agreement is by definition two parties that know each other, that set the terms, and set the price. This is not that case. This is many parties, as they admit. It's across 10 states and two time zones. The bids and offers go through an algorithm that isn't matching. There must be a minimum of three parties every time one bids. So by definition, this is a multilateral agreement. And so to the extent that the characterization of the agreement is bilateral, that's just erroneous and has to be corrected. Furthermore, the supporting commissioners relied on their sort of strong argument that petitioners were motivated, somehow improperly motivated by seeking an RCO in their objections. And that was a not factual, but also then the commissioners didn't address a specific language in Order 888 in the rules themselves that were contrary to the supporting commissioners' position. That's with regard to the senior agreement. With regards to the tariff order, let me just pause there, Your Honor. Did you want to focus specifically on the agreement at this point, or also the tariff order? Well, if there are no other questions about the agreement from my colleagues, then I guess if you could say something about the application of the Mobiles here. Yes, Your Honor. At core, one of the fundamental problems with application of Mobiles here is, again, Commissioner Daly determined that his basis for this is that he specifically wants, proposes that the Mobiles here presumption applies to all tariffs. He knows that his position goes against precedence, and Commissioner Christie, again, specifically relies on this being a bilateral agreement. So Commissioner Christie's view is that it's appropriate to apply a Mobiles here presumption to a bilateral agreement. But obviously, when there's not a bilateral agreement, then that presumption does not automatically apply. And what the commission's sense of precedence says is that there, at the very least, has to be a balancing analysis of provisions that are not generally applicable versus those that are more contract provisions. In the record in this case, that balancing analysis was never conducted in the first instance. So there was no record on which the commissioners could rely to determine that Mobiles here presumption should be applied. I do have some questions about jurisdiction under 824 AG. So just looking at the plain language of this provision, what is it about this statute, just looking at the text, not the legislative history, that gives us jurisdiction to review the deadlock order itself? That's right. When read together, Section 205G and Section 313 require deadlock orders to be reviewed on the merits based on the supporting statements. And that has to do with when taking 205G1's language, it specifically determines that if the 60-day period under 205D, the notice period expires, then under A, the failure to issue an order accessing or denying a change by the commission shall be considered to be an order issued by the commission. It shall be considered an order for the purpose of re-hearing. Correct, Your Honor. And that's because what the court is reviewing is determined upon what is brought up in the request. Sorry, the court is reviewing a judicial review under 313B is determined by what's under, what is brought up by petitioners in 313A. So in order to have something to review, the requesting parties have to respond to the commission's decision that there is no order if you're still just at the record. Then what would come before the court is the entire record and there would be no agency decision. And that really goes against the construct here, that there is a commission order to be reviewed and that there is to be the written statement as part of that record. So the way they work together is that that statement, the written statements are what the parties are responding to in under 313A. And there's for re-hearing. Not sure that anything in G changes our case law under public citizen or the two FCC cases that public citizen relies upon. I mean, this order takes effect by operation of law, which means there isn't any commission decision. And the statute says that each commissioner separately, right, is adding to the record their statements. But I don't think that changes any of the reasoning of those underlying cases, that there's nothing for us to review. Respectfully, Your Honor, 205G was a direct response to the court's- That's what the legislative history says. But what is the text that Congress actually enacted doesn't seem to get around the problem in our case law. Well, Your Honor, it's not that there's nothing to review, but the language specifically states that this shall now be considered an order of the commission. For the purpose of re-hearing. And then the only thing that's judicially reviewable under G is if there is a deadlocked re-hearing order. That becomes judicially reviewable, but we don't have a deadlocked re-hearing order here. Here we have a re-hearing order that's focused on timeliness. But, Your Honor, it goes on to say, 205G goes on to say in 205G-2, that an appeal is pursuant to the subsection, a person seeking re-hearing under H-25LA, and the commission fails to act on the merits of the re-hearing request by that date, the commission, because the commissioners are divided two against two. But we don't have that circumstance under two. That circumstance isn't obtained in this case. There wasn't a deadlock. That's a re-hearing decision. For the acceptance, there is, Your Honor, there was no, there was... initial order, but there was not a deadlocked re-hearing order, which is what two is talking about. Well, in that case, it's the re-hearing was denied by operation of law, but it wasn't denied by operation of law in this case. The commission voted 3-1 on re-hearing, that the re-hearing petition was not timely. I'm sorry, Your Honor. Yes, but the rationale for that, again, relies on the initial deadlocked order. Where in the statute does it rely on that? No, the rationale of the timeliness decision is, I mean, at this point, that's a review of timeliness order and not of the deadlocked order itself. I mean, that order... But the deadlocked order is not, we don't have jurisdiction over the deadlocked order. Nothing in G gives us jurisdiction over the deadlocked order. Your Honor, well, in that, I mean, we have appealed the request, the denial of request for hearing on timeliness. And at this point, the rationale for review, so if the court has determined that the timeliness order was incorrect, then it's still back at the decision with regard that's a deadlocked order. And Your Honor, a petitioner would argue that that still should be read, especially if it were to be sent back to the commission. It would still be reviewable under 205G. And that guidance should be provided on what the commissioner should be, the standard review that would apply. I'm not sure I understood your response. And I think that, as I understand Judge Rao's question, it is that, I guess, dovetailing with her earlier question about patent power and life, is that if the, what we have jurisdiction over is the denial of your rehearing, the relief you request in the rehearing, by the rehearing. And if that rehearing order was erroneous, assuming we agree with you on how to interpret the statute's timing, jurisdictional provision, then why isn't the proper relief to send it back and have them evaluate the rehearing request on the merits and leave it at that? Well, Your Honor, and I just know that I am out of time. That's fine. We'll let you know when you're done. Okay. Thank you, Your Honor. Your Honor, that is correct. That is the correct relief for the acceptance order. However, as we've noticed, the same issues are involved in the tariff order. And the tariff order is properly before the court, and we have asked for relief of the tariff order as, and the commission is also already relying on the acceptance order's rationale for further, the amended agreement's rationale. So again, Your Honor, as I would, as a petitioner, I would tell them that the court has before it the tariff order as well, and that should not be, that would need to be addressed at the same time. But it seems like some of the rationale for then in order for it to work properly and to implement it, some of these provisions of the tariff have to be effective, like the toggle feature and other things. And so it seems like, and that explains why, you know, there was a headlock on the agreement, but on the tariff order, because it seems like at that point, the consideration of the tariff order was affected by the fact that the same agreement was. And so I guess what I'm trying to understand is probably what the best thing to do would be to essentially vacate the tariff and send this back to FERC to properly consider all the items that were raised on the brief, and then go from there. That results in them also, again, approving the same agreement, and that's what it results in. And if that results in them approving the exact same tariff order, that's what it results in. And then if need be, then you come back to this court. Respectfully, Your Honor, the third vote for the tariff was specifically because Chair Flick disagreed with the issue of mobile tariff coverage. But the tariff order specifically deals with the merits of the questions of the toggle feature, the enabling agreements, basically the participation elements, and finds and addresses those on the merits very clearly. The reliance, there's not a direct reliance in this tariff order, in the acceptance order. There is a similar logic underlying some of the approvals, some of the elements in this tariff order on the same nature, on the same erroneous characterization of the agreement as bilateral. But the commission very specifically addresses the merits on this tariff order and addresses them in some sense with the understanding that they were separate. And Commissioner Munz raises these points in her dissent on this. I think the issue is that the market is now up and the injury to petitioners is continuing. As the market is continuing in a way that's giving monopoly utilities a competitive advantage, that advantage continues while the matter is being reconsidered. So because the commission has made independent findings on the merits with regards to the tariff order, it's critically important to address those merits while they're served before the courts. So Ms. Fidler, so on your view that these two orders are independent, then it would be fine for us to remand the rehearing order on the deadlocked theme agreement, but uphold the tariff order. I mean, I know that's not the relief you're seeking, but you're suggesting that they are analytically independent. So the fact that we are remanding the theme agreement doesn't mean that we would have to necessarily complicate and remand the tariff agreement. Procedurally remanded, that is correct. Thank you. Any other questions, Judge Stegall? We'll give you some time off. Thank you. Mr. Kennedy? Yes. Good morning. We'll hear from you. Good morning. May I please report on Robert Kennedy on behalf of the commission? I guess I'll take a hint and start with the timing issue. A unanimous commission found that petitioner's rehearing requests were untimely. And they did so by interpreting the notice period in Section 205D in exactly the way this court says should be interpreted in the end mission, that is, as a maximum waiting period that can be imposed on utility. And this flows from the structure of the act. As the Supreme Court said in Memphis Light, which is discussed in the commission's tariff rehearing order, except as Memphis Light discussed Section 4 of the NGA, the corollary of Section 205 of the FDA, the court said, except as specifically limited by the act, the rate making authority of utilities is just the same as it is of sellers of an unregulated commodity. Now, one of the specific limitations in the act is this 60-day notice period. But because the statute leaves the utilities rate making authority undisturbed, except as specifically provided, the Supreme Court said that the notice period, that the embargo on rate change imposed by the act, must be interpreted in a way that allows for the earliest effectuation of rate changes. And that's what the commission did here when it said 60 days in 60 days. How is that consistent with FERC's own rule 2007? Well, I think there's a couple of responses to that, Your Honor. I mean, you have a long-standing rule. I mean, some form of this has been in place, my understanding is, since the 40s. I know the rulemaking for this goes back to 1982. And the 1982 rule, I believe, is very similar to the same rule that's been in place since, I think, 1947 or 48, something like that. And the commission has consistently taken the position that, while that rule can be applied to deadlines for filers, it cannot be applied to the commission's implicit statutory period to act on rate filings, because that would impermissibly extend the burden, the waiting period imposed on utilities by Congress. And the commission's interpretation sort of tries to... So, is the statement in the petitioner's brief that the commission has repeatedly stated, including in the Federal Register, that this rule applies to this very time period? Yes. Is that too long? The commission's emergency... Yes, and the rulemaking... Yes, what? Yes, it's long? No. Yes, the commission has stated... Yes, that's correct. ...in those rulemakings that it could be applied to their statutory timeline. But in practice, they were talking about emergency situations in those rulemakings. In practice, the commission's consistent practice has been to act prior to the proposed effective date set by a utility when that proposed effective date is on a holiday or a weekend, to not take advantage of the rule, to not apply to Rule 2007. And the distinction the commission is drawing is basically saying, look, in the Federal Power Act, Congress has imposed on agreed parties the obligation to seek re-agreement within 30 days. If the 30 days are closed on the 30th day, if that happens to be a Sunday, we're going to extend the deadline because that satisfies, that gives effect to the intent of Congress giving you 30 days to formulate your re-agreement request. Conversely, the obligation imposed in Section 205D, they're not filing a rate proposal that the commission gets to vote up and down on, as the Supreme Court noted in the Moble case, the first half of Moble-Sierra. These are actual rate changes, and the notice period is just an embargo. So the commission is saying, Congress said you have to hold your rate-changing authority on hold for 60 days, and we're going to keep it at 60 days. We're not going to take advantage of our regulatory rule to place a burden on you, utility, greater than what Congress did. How would a party here know that this is what FERC would do in this context? I mean, if they were to look at our case law and to look at FERC's own regulation, how would a party be unnoticed that FERC was going to do what it did? So, yeah, I want to make two points with respect to your lines. First, in this case, how would a party know? I mean, because deadlines need to be clear, right? We need to have a rule so people know what their obligations are. And it's kind of a dovetail with 825 DG. The one thing that's clear in 825 DG is that the purpose of re-hearing the commission's failure to act is the order. And on October 13, the commission issued a notice and said our failure to act occurred on October 11. Two days, two days, two days afterward. Correct. So they've lost two days. That's when the notice went out. But they've lost two days. But they were unnoticed. How would they be unnoticed if they looked at 2007? Well, first of all, I would like to just push back against the suggestion that's been made that they actually did rely on Section 207. Because if you look at the re-hearing requests, which are page 1100 and 1118 of the JA, what they sought re-hearing of was not the commission's failure to act. They sought re-hearing of the notice. They dubbed that the agreed in order or the deadline. In fact, page 1102, the re-hearing request specifically says, on October 13, 2021, the commission failed to act within the six-day period set by Section 205. October 13 is the date of the notice. Not any – you can't reach that date using any calculation under 207 that they've posited thus far. They've misread the statute and thought that the agreed in order was the notice when, in fact, the commission's failure to act. So I think the notion that there was actual – and that explains why they filed on November 12, because 30 days after October 13 is November 12. So the notion that there was actual reliance on Rule 207, I think, is misplaced. But again, how could a party know? They would notice in this case that the failure to act, key clear trigger for re-hearing under Section 824 EG, occurred on October 11. And yet, this – also, how could this – It didn't occur on October 11, though, which is Columbus Day. Because the statute says utilities have to give at least 60-day notice here. And here, they chose October 12 as their proposed effective date. This court's decision in national fuel gas agreement says if you pick an effective date as within that period to act. So the commission could have – I'm sorry, can I just go back to Judge Rouse's very first question? I just don't understand. Rule 2007, it expressly applies to any time period that is prescribed or allowed by statute or regulation or commission order. Well, I think the language of the rule itself, I believe, is any time period. Yeah. And we've held, right, in the City of Batavia that that applies to the 30-day period, right? Right. So I just – it seems to me you're making this thing exceptionally complicated when the answer is really quite simple. It's just the plain language of the rule, 2007. I don't – what am I missing? Maybe I'm missing your question. The plain language of the rule applies to – I think it says any time period. Yeah. And the argument is, well, your section 205D, even though it's worded as an imposition, an embargo of the utility's rate change, that doesn't affect a time period when you act on a response to a rate fine. Right. And the commission's position is, if 207 could be applied – if the language of 207 could be applied in this circumstance, it can't be because that would be overriding and improperly extending the notice obligation imposed on utilities. So shouldn't the commission amend its rule? Well, I mean, that's a possibility, certainly. But the point is two. One, there is no evidence in the record that relies on that rule. Two, parties are placed on notice that this is how we're calculating the date. And three, if it could be applied to this circumstance, if the language is broad enough to cover it, which admittedly, it's an any time period, that would be inappropriate to do it because it would conflict with the 60-day notice period in section 205D. The commission would be without power to extend the sort of embargo on rate changes that Congress imposed under section 205D. Even though in every other statute that I'm aware of, the deadline imposed by the statute falls to the end of August. So that is a threat. Yes, because I think the language of section 205, the precise language is important. Yes, implicitly, if the commission wants to act on a rate filing, it needs to do so before the proposed effective date. But what section 205 does is impose notice obligation on utilities. It says you make a rate change, it can't go into effect until there's been 60 days of notice. So it's really an obligation imposed upon them to pause on their otherwise undisturbed rate making authority. I think that's what differentiates it from deadlines you might see in court proceedings and the like. Mr. Kennedy, if you could address the question I asked petitioners, which is, I mean, if this court were to find that FERC's rehearing, you know, that the rehearing petition was in fact timely, why isn't the appropriate remedy to remit to FERC to consider the rehearing So I think that is, as you know, the sort of the standard procedure. What makes this case different, among many other things, is the fact that you have before you majority voter orders from the commission that deal with many of the same issues that were raised with respect to the agreement. So the court has restored the commission's post-rehearing word on a lot of these issues that were raised in both cases. As a practical matter, you have the commission's position on whether the tariff provisions are just as reasonable. If we were to find the tariff provisions were just as reasonable, assuming that we found that, would there be no reasons for a remand in the deadlock order rehearing? Would that resolve the issue? I mean, petitioners suggest that there are analytically different questions in the two orders. The commission did carve out, if you look at the tariff order, it deems some issues as beyond the scope because they have been resolved in the diversity of the agreement going into effect by operation of law. But I think the others, again, you have the commission's considered judgment on those questions. So they are analytically distinct in that they were addressed in two different packets, but it's the precise same arguments that the participation requirements are really discriminatory. That's the same analysis, whether there exists an agreement or a condition to making use of the tariff. Can you also say a little bit about why FERC believes that we have jurisdiction over the deadlock order? I mean, under the plain language of 205 DG. So I agree with you, Honor, that 205 DG, anyway, it assumes a world where there's a deadlock, rehearing, another deadlock, and then it provides a judicial review in those circumstances. I don't think it gets you there because there is no subsequent deadlock. I think the standard of review for whether we, if we had jurisdiction for a deadlock order is very faxing. And I'm not sure that the statute here gives us any guidance that changes the reasoning of the public citizen case and, as I said, the two FCC cases that preceded that. So, you know, listening to what you said before, I'll try to find myself just the language of the statute. I think if you look at Section G1A, which talks about deadlock, that gets you to rehearing. Obviously, it references Section 825 LA. In the Allegheny case, this Court describes Section 825 LA as establishing the precursors to judicial review. So I think there's some suggestion there that there would be review on the merits. And then if you had a subsequent deadlock on rehearing, again, Section 825 G2 references an appeal under Section 825 LB, which talks about the, which, you know, the standard provision for judicial review in the Federal Power Act where it typically applies to be arbitrary. But the statute doesn't really tell us what we would review, which was the concern of this Court in those other cases. Right? So I know the Commission takes the view that we should just look at, you know, we should look at the record as a whole. Well. On some very deferential standards. Sorry. Our position is a little more nuanced than that. One, what should be reviewed, I think what differentiates this case from some of the others is you have congressional language deeming the deadlock to be an order. Both for purposes of rehearing and then essentially for judicial review if there's another deadlock. So I think that case, it differentiates from the FEC case. Implicit finding is not just an order. It's an order accepting the rape filing. So the implicit finding of that order, that the rape filing is just and reasonable. And our position is. It's not a FERC finding. It is a congressional judgment that in a deadlocked case. Such rate goes into effect. So what if Congress were to enact a statute that embodied the same agreement, right? It says we approve the same agreement and they enact that into law by the President. But this Court review that under arbitrary and capricious review. No, we could be deciding whether Congress had behaved reasonably. It would be. I don't think that's how we review statutes. No, right. But again, you know, the. And this is the intent of this was was to have the Court look at the. I guess based on legislative history intent was to have the Court. Maybe I think the legislative history is a bit murkier than some of the briefings suggest that. Well, in particular, if there's any questions that I would direct your attention to. Supplemental appendix age 4 and 5 of Representative Kennedy's statement as to this. But I take the point as to the as to the. The standard, we believe the agency action would be the congressionally directed acceptance of this. Basically saying, you know, it's 2 to split to who voted in favor, who would have voted in favor of the rate change for the governing group. The implicit finding is that it's just and reasonable. Is there evidence in the record to? To assess whether that finding is a restraint, which is in our position, is that the commissioner statements and can be guideposts and anchor. Position in its 3rd Circuit case. So why is first position different here in the 3rd Circuit? I mean, are these cases materially distinguishable? Because it seems that Burke is testing out different theories and different circuits. Well, and we perfectly can. We're trying to work our way through a statute that Congress is directing a lot and figured out that trying to figure out the best way to apply it. I believe our positions in both cases are are in parallel. Again, in both cases, we're saying that on the merits review is appropriate. In both cases, we're saying the agency action for purposes of review is the congressionally directed acceptance. In both cases, we're saying the arbitrary, arbitrary, standard of review is the appropriate standard. In both cases, we say the commissioner's statements can anchor the course review where they differ, and I think it's a matter of context. In the 3rd Circuit case, the argument was you can't look at anything similar to it. There's no agency action. Therefore, the statute requires an automatic remand. We argued no, and we said, well, these commissioner statements, they're there for a reason. Look at what we have. You can subject them to APA. You can subject them to APA review and look at them. The question here is there must be, and our position here is that nothing in the language of Section 824BG requires or imposes all the requirements of the APA on those commissioners. Well, how? That's where it can look. I'm sorry, you finish here. Well, let me just pursue your line of questioning here with Judge Rao. Well, so just take an example. Actually, it's not an example. It's this case. So the two commissioners, the two commissioners relied on record evidence and expert that the Seen Agreement would yield, well, $40 million worth of benefits or something. A big number, right? And there's a affidavit in the record challenging that, saying the analysis is flawed and a proper cost-benefit analysis would come out the other way. Now, the two commissioners did not address the rebuttal evidence at all, right? Didn't say a word about it. I just want to make one issue with one, well, to immediately answer your question. Well, let's stick with my question. So it's largely correct, isn't it, what I just said? They did not mention, I was just saying that they, yes, they did know that there were evidence in the record of projected benefits, but they also said the benefits here are obvious and there's virtually no contest. So there was also quality. But they didn't, they didn't. I mean, in a classic APA case, that wouldn't be, we would vacate that. It would be a simple administrative law one-on-one vacate. Well. Because the commission made a decision without considering, without explaining, explaining why contrary evidence didn't change at all. We would, we would vacate. Well, I would take issue with that in this case, because A, they noted, they took a quality, in addition to noting the projected benefits, they also took a quality, if you look at it. No, no, stick with my point. Do you agree with me that in a regular APA case, that would be, we would, we would vacate that decision and send it back for failure to consider the full record? And so my question to you is, what, what do we do with that? How do we evaluate that, that rebuttal evidence, that expert testimony, which said, which challenged the benefits of the SEMA agreement? Do we just look at it ourselves and say, okay, yeah, we've read them both. And we think that, that the commission could have reasonably relied on the, on the experts that did. I mean, how do we do that? Usually we defer the commission on these things, but we, I just don't know what we would do with that in this case. Did you see my point? I do, and I'm going to give you a direct answer to your last question. Yes, but I do want to back up a bit. This is not a case where the commission or any of the commissioners looked at a, looked at a benefits analysis and did a metric cost benefit analysis. The commission explicitly made this point in the power of orders, generally on qualitative benefits. I agree with that. Your point's my take home, but I don't think that changes the point I made. But you're right, but that doesn't in any way change my concern that, that the commission relied on a piece of evidence against which there was serious rebuttal evidence, which it didn't consider. Well, I guess, and again, I don't want to say you're hypothetical too much. That's not the hypothetical. I think it's the case. No, I think it is the hypothetical because he, again, the commissioners noted projected benefits, but they also found qualitatively, undeniably, this is going to be, this is going to be good news for consumers. We're bringing people to the market who think they can, rather than generate themselves and enrich their own generators, they can issue for the market. I don't want to pursue this too far. But look, if the commission, let's make it really simple. If the commission says, if an expert says $40 million worth of benefits, right? And the commission relies on that. And there's a rebuttal affidavit, which says that's wrong. It's not $40 million, it's zero. Doesn't make any difference what else the commission said about the decision, whether it relied on other evidence, it failed to consider a fundamental piece of evidence that is contrary to what it concluded, right? So, how would the commission, yes, in that circumstance, yes. Okay, but your point is that's not the case, right? Yes, but is that a legitimate objection? Yes, we would ask that there's support in the record for not turning, not reversing course based on that evidence. That would be something for the courts to look at. And I know we're in an odd circumstance here, but I don't think it's out of bounds. It's the first time I've ever seen anything. Section 706 explicitly says that, in conducting arbitrary conditions review, the court can look at the record with specific parts of the record pointed out by the parties. Let me just change the subject briefly, because we've been talking for a long time. Could you just state for us, step back and state for us from the commission's point of view, what exact issues are before us at this point? What is the exact issue? So, whether the, so with respect to the agreement, I think we have to divide it between the agreement and the target. Okay, start with the agreement. With respect to the agreement, is there support in the record, the record being the commissioner's statements and the record, for a conclusion that acceptance of the agreement was not arbitrary? What about the timeliness question? Do we have to decide that first? Yeah, yes. Okay, so what's that? Whether the commission would reasonably concluded that it could not use its regulation to extend the statutory notice period section. Okay, and suppose we think the commission's wrong with that, then what's, then what do we do? Well, again, the standard practice would be a remand, but again, this is not the standard case because you have the commission's post-rehearing word on a lot of the issues that are common to the two. Okay, so if we think, so number one, if we think it's timely, then we go on and decide the merits of the challenge to the scene, right? You think the rehearing requests are timely? No, then I think the standard practice would be to, you know, like I said, to remand for consideration of the rehearing requests. I thought you just said they're intimately, they're related to each other. We should decide those questions. That's why I asked you to give me a summary here. I thought you were about to explain, clarify this to me. I apologize, that's not what I'm going for. Okay, try again. So on the agreement side. Yeah, oh, let's start with the proposition. Let's assume we think that the petition was timely. Now, is that the end of the case? So we would say no. We would say what? We would say no because the commission, because the court has before it, the commission's final word in the distinct tariff proceeding on many of the same issues. Okay, so then number two, then we would go on and decide the deadlock question in the standard of review, right? No, I think what would make most sense is to remand to the commission those questions that were not resolved in, that were not spoken to and resolved in the tariff proceeding. What would we do with the same agreement? Well, I would suggest the appropriate court, if the court agrees that the petition position that there was timely, remanded, I would suggest that they cater to the commission for consideration of the issues that were not fully addressed in the tariff proceedings. And the main one there, I think probably is the mobile survey. What happened to seeing in your analysis? Where does that go? That's what goes back to the commission to consider on the merits? Consider the rehearing request on the merits, yeah. As to those issues, we would say, again, the court has before it the final resolution, the post-rehearing word from the commission on many of these issues that were raised. So the same agreement would still stay in effect while we hear it, if it went into effect by operation? We think that would be the appropriate. But yes, yes, we think that would be appropriate. If the court were inclined to determine that it actually had jurisdiction to consider the claims with respect to the same agreement. That rehearing was timely thought. With respect to the tariff order, explain to me why this is an abuse of power? Why isn't this a multilateral agreement? Why isn't it either special or discounted when order 888A seems to say that non-Pancake is not a definition of discount? Also, what the commission explained here is that there's two pieces to that. Is it discounted or is it special? This is a unique or new service, so it's not a discount of any distant service. So then you get to the question of whether it's special. And the commission interpreted special by looking to order 888, which equated special in the same vein as favorable, not the alternative interpretation posited by petitioners that that should just mean unique. The commission looked at the language of 888, said no, it should be favorable. Looking at all the characteristics of this new transmission service, this $0 transmission service, it found that in balance it wasn't favorable. Yes, that's a favorable characteristic. Obviously, it eliminates rate pancaking. But fundamentally, it's the lowest priority. It can't be used to satisfy your liability obligations and fundamentally, you can't count on it to be there when you need it. So on balance, it is not a special transmission service. And I think you just sort of step back, check that analysis with the gentleman. Why didn't they just write the order without the, you know, with regular pancakes? I'm not sure I understand your... I mean, why was the tariff written the way that it was? With zero, with no charge transmission service? Yeah. Well, I mean, that's the goal, to take advantage of that unused transmission capacity to impose no charge on it to enhance these bilateral transactions between the parties at the sub hourly breaks. There is no... But one could construct it with the normal transmission, right? And I think, yes, you could impose transit, but I think one of the reasons behind using the zero charge is that the transmission charges, the normal transmission charges could be an impediment to fostering these sub hourly trades. It can make them... People are only coming to the market. They don't have to. They're only coming to the market that makes economic sense. If they can buy power and get it to them, get it to where they need it, less than they can generate it and transmit it themselves. So by raising the cost of the transmission on these transactions, you take away the economic benefits and you may disperse. That's why it's written with no charge. And to kind of look at Order 888, the purpose of open access, yet you care about these loose power poles because you don't want a select group of transmission providers to have preferred terms for themselves. And that's not the case here because everyone who can participate in the C market can access this transmission service at no charge. Not everybody can participate in the C market, including like 65 participants who participate bilaterally, right? Right. That's the fundamental complaint that you... One of the participation requirements is that you'd be a generator or a percent demand load within the footprint of the market. And the commission found in the majority of those tariff orders and Mr. Christie said this as well in his statement, that that's just a function, a technological requirement. It's given the short time span... But it's a technological requirement developed by C. It's not like some innate technological problem. It's a technological problem that by its terms results in the exclusion of C. What's the number you just said? 65. 65 entities outside of C. It's not a problem created by them. It's a function of the fact that where the market is located... No, no, no. It's created by them by having the algorithm do trades at less than 20 minutes, right? That's... Yes. Okay, so it's a technical barrier created by C. And there's nothing I've seen that suggests why that was inherently necessary for the C market to operate. Because the whole idea of the C market is to foster these sub-arrow trades where you can save a little money. What's the magic of 20 minutes? What about 25 minutes? Well, I'm not certain what... Well, it's 15, first of all. Oh, I'm sorry, it's 15. You're right. I'm not aware of how long it would need to be to, you know, for them to... Well, without some explanation by that, and all we have is an arbitrary, at least on the record, the 15-minute requirement just seems... What it is, is it's exclusive. That's its impact. Yes, it's a participatory requirement. Okay, let me ask you a question about... But Tim, go ahead. No, I was just gonna... I just had one question to follow up on Judge Wilkins' question about PowerPool. The coalition cites... They cite a provision in Order 888 which gives non-pancake rates as an example of a discount. It's right in Order 888. And I didn't see... The commission didn't say anything about that. You didn't say anything about that. You need to read it. Well, the commission found that this is not a discount rate because it's a complete... Because it's non-pancake, right? No, because it's a completely new service. It can't be a discount of an existing service. The example in the 888 is, you know, our firm transmission from A to B normally would have pancakes, but for you, we're gonna give you transmission service the same... I see, so you're fundamental. Your basic point is that it's new, it's not discounted, and that's the end of the analysis. No, the second part of the analysis, then whether... Yeah, as to whether it's discounted, that's the end. Then you consider whether it's a special transmission arrangement. And the commission found, as I explained to Judge Wilkins, on balance, the fact that it was lowest priority meant that it was not favorable. Did the commission ever say that that's the reason why 888 doesn't apply? Yeah, the commission is through Order 888, which talks mostly about this purpose. And just coming back to the point briefly, as I know I'm way over time here, the geographic limitation. Commission's role under the federal power is passive, it reviews things. Here, the parties proposed a solution, an interstitial market that was gonna benefit consumers. That is the main goal and only aim. The fact that it could have been designed better, maybe they could have... The 25-minute point was that what they proposed was just and reasonable. The fact that there's another solution out there that could have been more just and reasonable in the commission's determination didn't affect enough. Its role is to look at the proposal before it and assess whether that's just and reasonable. Any other questions? No. No. All right. Thank you, Mr. Kennedy. And now we'll hear from intervener for response, Mr. Fitzgerald. Thank you, Your Honor. And may it please the court, Matt Fitzgerald on behalf of the members of SEEM. SEEM was created to bring millions of dollars in consumer benefit across the Southeast region each year. And it's important to note that it is a residual market. It's existed now for several months. And in that time, never on any day has the power transacted through SEEM exceeded about 3% of the power used across this region. It is interoperable service of the lowest priority. And it works only when there is vacant transmission space available. Now, there's been some discussion of the cost-benefit analysis in particular by Judge Cato. I'd like to say the statements of Christie and Danley at page 64 and 97 of the joint appendix say there will be benefits to consumers. So they're looking at this $40 to $100 million analysis and they're accepting that. And additionally, the experts from the coalition on the other side, there was a suggestion that he found there would be negative benefits to something like that. But actually at page 819 of the joint appendix, he said, basically, I can't figure this out. And $40 to $100 million is an upper bound. So the comparison is, is it really $40 to $100 million or is that an upper bound? And it's reasonable for Christie and Danley to kind of come to the place that there will be obvious benefits to consumers. Now, as for the multilateral sort of pool and the discounted service point, it's important to point out that even if you think this is a multilateral setup, even if you think it's discounted, there are only two places that that goes. There are only two reasons that that matters. One of them is that a joint tariff would be required, but we got a waiver of the joint tariff requirement, page 147 of the joint appendix in the tariff order. And the other is that it would require open access. And FERC concluded, again, by majority in the tariff order, at page 147, that we are open access to the extent of technological feasibility. And could you just explain that to us? That would be a big help if you could explain the 15 minute thing and why that's essential to this. Could you just step back and teach us about that? Okay. Sure. So the way that the world works in the energy market... That's a great way to start an answer to the question, the way the world works. It works day and hourly. So transactions are done in the normal sense, hourly. There are some sub-hourly. They're not common and they're not ordinary regimes for them. The whole idea of the scheme is to squeeze out a little bit of benefit in a residual sense by allowing these intra-hour 15 minute transactions and by providing free transmission for that. So in theory, some of that could exist today, but the transactions do not occur because of the pancaking. It's too, it's uneconomic and it's not logistically possible to do these narrow timeframe, you know, to fit it in and, oh, there's some transmission vacancy. We have a bid, we have an offer, boom, there's a deal and the power goes. Okay, but wouldn't it be even more efficient and a better market if the entities that are outside of the SIEM territory could, they participate now, right? Before SIEM, they were doing trades. Wouldn't it be a better market if there were a bigger market including them? Your Honor, yes. And we are expanding SIEM all the time. We're already going into Florida. We have new members in Florida. So when we talk about this geographic limit, I want to be clear, anyone who is, any generator or sink who is connected physically to the transmission system of any of our members and we're looking, we're expanding, looking for new members can participate. So when the other side says, oh, there's 65 trading partners excluded. I'd like to say first, that's basically just a citation to an unsupported assertion that they made below. In other words, we haven't seen a list of these 65 companies. But even if there were some trading partners under the existing regime excluded, my strong belief is that those are companies inside of neighboring RTOs. So there's a map at page 12 of the first three. It's a map of the SIEM territory. But what it doesn't show is the borders of RTOs which are to the north and to the west. Companies that are located inside of those RTOs are fundamentally positioned differently. RTOs don't have this free transmission. RTOs aren't set up for these 15 minute interstitial things, which is our whole idea here. And so to deal with them is just a categorical different bucket of fish. It is beyond what is currently technologically possible. Now, one final point on- I still don't, just say one more thing about beyond technologically possible. Could those RTOs- Could they adjust somehow their system to accommodate the 15 minute algorithm? Your Honor, whether they can do that would be up to, I think, not only companies inside of those RTOs, but the central command of those RTOs. And to be clear, we don't have a categorical opposition to that. It's the system we've created for the companies who are similarly situated, which doesn't, and doesn't go into those boundaries. It's just a different, both categorical, different issue to take this idea into an RTO versus not. All right, thank you. Mr. Fitzgerald, intervenors don't challenge standing here for the petitioners. Is that correct? We don't, Your Honor. Not in our briefs. That's right. Do you accept that all of the petitioners here have standing? I don't think it matters if all of them have standing, if any of them do. Do you think there are some candidates that are more likely to have standing than others, some entities? Yes, probably. That's true. Yes, definitely. But I think it's important to note that there aren't any individual companies. When I look at the list of who's in the coalition, it seems like there are, there are associations which are often made up of renewable energy producers. And I want to be clear that a renewable energy producer, that's a generator, who is physically connected to the transmission system of any of our members, is welcome to join. And once they join, they are subject to the exact same rules as any member. There is no disadvantage in the operation of this market where the rules as applied to any participant versus others. But don't the utilities have veto power to keep them from becoming members or participants? No, Your Honor. I don't think that's the allegation that's been made, and I don't think it makes sense. There is a committee that is made up of members, and the members, keep in mind, include the federal government, the Tennessee Valley Authority. It includes electric co-ops, which are just consumer-owned entities, and local and state governments. So I don't believe there is any power for who are the bad guys in their view, which is the big investor and utilities. Does it take the unanimous vote? I'm sorry? What is the voting requirement for who accept the new participant? So there is a committee which is made up of the members, and all that they do, my understanding is, accept when a new member satisfies the criteria, which is just being plugged into a member system, making enabling agreements, which is agreements to sell power, which is what they all ought to be out there doing anyway, with at least three of us, and they sign agreeing to follow the rules of the system, then they come in. I don't believe anyone has been turned away. And we have been adding members, but they don't have to sign the enabling. Correct. So the enabling agreements are all bilateral agreements, one-on-one. Companies agree to deal with each other, and they have terms like credit terms. One company agrees to deal with another company, they make an enabling agreement. If you have three, you need three enabling agreements at least, and to have at least three entities toggled on in order to bid or offer into the market once you're in. But the enabling agreements are just an ordinary feature of any bilateral market, which is the companies can deal with who they choose to deal with. And they're particularly important for us here because of QBA, which is subject to a completely Byzantine series of regulations about who we can sell power to and deal with, which comes straight from Congress. TVA, right at the core of our area, connects numbers to other members. It's important that we have a system that can bring them in. And a lot of what we've done here is to accommodate the TVA in that way. Can I ask, I want to ask you the same question I asked Mr. Kennedy. So would you just tell us, you know, give us a decision tree. What issue do we, what issues do we have to decide in in Waterloo? So, Your Honor, and there's... From your perspective. I'm sorry? From your perspective. What are the issues this court has to decide? Do we start with timing, right? You start with timing. Okay. And suppose we think the petition is timely. Okay, if you think that the petition is timely, then you are in place where you are positioned to review the thing that led to the Seymour, the deadlock, if you will. So when you're positioned to review the deadlock, you have procedural options there. Perhaps you're not loving any of the procedural options. But what you do have there, and what's unusual and unique and helpful to you, is the tariff order. Because the tariff order is a majority order of the commission. And it specifically entertains, analyzes, and rejects every argument that petitioners are still making in this case, except Mobile Sierra. So the tariff order solves the procedural review. You review the tariff order. So in other words, even if we thought that the deadlock order by itself would be a problem, or would create a tricky standard of review issue, that's solved by the existence of the tariff order, right? Yes. Except for Mobile Sierra. So what do we do with that? Okay, so here's the thing about Mobile Sierra. The arguments that petitioners are actually making on appeal against Mobile Sierra are very broad. But Mobile Sierra has been cut back vastly since it was originally accepted by operation of law. There are only about 20 provisions left that are subject to Mobile Sierra in the agreement. And they are internal governance issues, which are not of the sort that could plausibly hurt the public. So for instance, what's still subject to Mobile Sierra is things like how the members divvy up costs among each other, how they deal with dispute resolution among each other, protections of the status of non-jurisdictional, non-for-jurisdictional members. So there really isn't that. So the way you deal with Mobile Sierra is there is no place in the petitioner's briefs where they call out any specific provision still subject to Mobile Sierra and say how that poses a great danger to the public and should not possibly be within FERC's discretion to do. Mr. Fitzgerald, it seems both the commission and the petitioners view the two orders, the same agreement order, the deadlock order and the tariff order is analytically distinct.  that our review of the tariff order would inform our review of the deadlock order. Definitely. And I think we're talking past each other a little bit because in some sense, they could be analytically distinct. So in other words, I think it's because petitioners' arguments here are all really attacks on the same agreement that they've learned together. So in other words, even if let's say the deadlock or appeal were untimely, so you're setting aside the deadlock order, you're just looking at the tariff order. Petitioners could appeal the tariff order standing alone if they said the tariff order does not faithfully implement the same agreement. That would be a standalone way. That's really what the tariff order is doing. It's accepting changes to the tariffs to implement. But because what petitioners have chosen to do is attack the same agreement, all their arguments, even the ones that say they're against the tariff order are problems with the same agreement. That's what brings them together. And that's why, and I think this is supposition, but I think the commissioners may have been trying to help this court when in the tariff order they realized, well, once you set aside Mobile Sierra, there are a majority of us who disagree with everything petitioners say about the same agreement. And so they wrote it all down and put it in order for you. And so the connection between the two is based on the fact that all the petitioners' arguments are really about the same agreement. So that's how it helps if you come to a place where you are reviewing whatever created the same agreement, which I agree is an act of Congress and not an act of FERC, but if for some reason you need to review the deadlock, the tariff order helps you, and that's why. How is that consistent with Chenery? It's consistent with Chenery because it's not an act of FERC that accepted the deadlock order. It's not an agency action finding or conclusion. And so it would be impossible for the agency ever to provide you an adequate rationale as an agency in the event of a deadlock. And I think it's important to note too that FERC has done everything here that the law requires of FERC. And frankly, so we, as the entities trying to propose a new rate. You know, normally when you entertain reversal or remand, something FERC has done, you identify it's done something wrong or something it's failed to do that it's obligated to do. But there's nothing like that in this case. The law says, I mean, clearly the commissioners are entitled to vote however they feel and what they think. The law says when you do that, you each write a statement. It's obvious they've each written a statement. They've each written a statement that clearly grapples with issues and considers it. We think the statements are good, but regardless of what you think, they're obviously good statements addressing the substance. And so FERC has done everything that it's supposed to do. There may be nothing to remand in this case. I don't understand your legal position in that. You say, well, the maybe, maybe it's commission's brief that words, but you say that the commission statements are starting point for review. You review the whole record. And so if the statements you find don't really respond to all the arguments made by the commissioners, it doesn't matter. We're supposed to be able to. As long as we can find evidence in the record to support and any reasonable commissioner could include, could have voted to prove this, then that's what we should be doing. Cite me a case for, in support of the way performing our review. The closest thing to a case in support of that are probably the SEC cases, where it's clear that this court does and can look into the record beyond the statements of individual commissioners. In those cases, I think that's mentioned in those cases, in which the statements are joint. I believe that those cases, they are joint statements here. They're not here. They're not. Does that make a difference? I don't think as a matter of law, that it makes a difference. I think when commissioners have gotten together in a joint statement, then perhaps you can squint and call that and review that thing like an order slightly more reasonably, but I don't think it actually solves the problem. So just one final point on the big picture order 88. A lot of petitioners are in the center around supposed problems with order 88. But here's the thing. Order 88H goes back to 1996. The point of it was that FERC did not want utilities favoring their own expensive generation over cheaper alternatives. Well, seeing exists and is created specifically to facilitate bringing cheaper power to consumers. That's what it does. The other part of it is it didn't want them favoring or disfavoring others' competitors by restricting access to transmission. That's just as important. Yes, and the finding of FERC, which is again in the tariff order at page 144 and 145, is that we are open access to the extent of technological feasibility. These borders that they complain about are categorically different in terms of what the technology allows. We find a way to save consumers millions of dollars by inventing this system that functions to this extent. Again, we're open to expansion and expanding all the time. Any other questions here, Ralph? No, thank you. Thank you. Thank you. All right, Council for Petitioners, Ms. Fidler, we'll give you four minutes. Thank you, Your Honors. I just want to note that with regard to timing it into a 5G, just a couple of quick points because I think the merits here are really the most important aspect of why this should be reviewed on the tariff order. And that is because this is a procedural note. If this goes back solely to look at the same agreement because the commission is back to a 2-2 split, it's very likely that there will be another deadlock back here in the meantime, but that could come back here for review in the meantime. The injury that is happening now continues and that gets to the merits here with regard to assertions that seeing is not a power pool. Order 8888 explicitly states that a loose pool is a multilateral agreement that explicitly or implicitly contains discounted or special transmission. And the agency has stated that this is a special or discounted because there are some terms that aren't fully favorable. But everybody has seen at some point a special offer today only. That doesn't, you can get a discount even if every element isn't particularly perfect. And there's nothing in order 8888 excluding non-firm service from that. The point is that it's not a discount because it's a new service. And that's wrong. That is wrong. Explicitly non-firm service is covered under 8888, 1213 states agreements restricting non-firm transmission. But this is a different non-firm service. Right. That's your point. It's a different non-firm service. It's a discount because it's just new. It's different. But there's no language in order 8888 stating that it doesn't apply to a new service. And if there were, then any new service would be excluded from order 8888's purview by simply saying, this isn't a discount of the existing service. This is a new service offered at a discount. It's obviously favorable. It doesn't have to be both. I can understand how it's a discount. You may be right. I just don't get why it's a discount if it's new. You can't. It's just that it's from the norm. If I buy a product, a different product, and that product is discounted. Is that a discount? Isn't it just me buying a new service? Your Honor. Discounted to who? No, Your Honor, and I want to understand your question. I think it's also important to recognize that it needs to only be special or discounted. And in this case, the special service is the fact that it's distinguishable from the norm. It's a different kind of service. And in this case, it's also a new service. So it doesn't have to be both special and discounted. Although the language that non-pancake rates are specifically considered a discount. Special doesn't suggest there's something beneficial to it. I mean, here we're just talking about the residual product. It's not some entirely new thing. It's just some residual energy production that is being sold at a zero cost or being provided at zero cost. Sure, but it's a service that's still a benefit to the user. I mean, that is residual is not a basis for non-application of Order 888, which explicitly does cover non-firm service. So there's no, there's no, this is still a favorable product. And obviously the commission and the utilities said this much repeatedly, that this would offer benefits. So it doesn't make sense to say that it's both offering all these benefits and then say that it isn't beneficial, which is one of the inherently contradictory statements here. Further, it's important to address the preferred terms about everyone being able to participate. That's factually incorrect. It's not just a geographic exclusion. Within the footprint, certain types of entities who are not a source or a sink, and we have testimony from in the standing affidavits that there are producers who have distributed energy resources and demand response services within the footprint do not qualify as a source or sink. So even though they can participate in the bilateral market, they can't participate in this one. And then with regard to the, independent power producers who are there, the fact that the agreement has all of these elements, enabling agreements, the participant agreements, and then the use of the constraints and the struggle, those are all discretionary. Other short-term balancing type or explicitly balancing agreements have mandatory participant agreements and mandatory enabling agreements. And that could have been done here. And it isn't. And that is really the crux of part of the reason that the petitioner's expert was unable to put the bounds on what the downside of this could be is because market power could be exercised through these very terms that are unfettered. So the extent to which the harm would go would be unknowable because that information is not made available. Now the agreement's been in place for several months. So what harm has resulted? Well, Your Honor, obviously that's outside of the record. So we, but as far as- What do you mean unknowable? First of all, we know that there are no independent power producers who have joined the team as has been predicted. And second of all, we know that the trades at this point are limited therefore between the big utilities. So the folks who are getting the benefits are the large utilities that were the focus of Order 888 to begin with. And this wasn't supposed to be, this is not about intent. Order 888 isn't about the extent of harm. That case-by-case analysis of what's the harm here and what's the harm here, that was the purpose of Order 888 where the commission had found that as profit-maximizing firms, monopoly utilities would have and will continue to exercise their market power in order to maintain an increased market share and thus deny their wholesale customers access to competitively priced electric generation. And that these unduly discriminatory practices will deny consumers substantial benefits of lower electricity prices. That comes from Order 888, that comes from the sports holding and transmission access policy study group and recently in Excel and energy services and the ACP versus FERC. These cases all reiterate that this is fundamental economics. This isn't this, how much harm is happening here or the intent of the parties here. This is why we have Order 888 and why the provisions are not, are expressed and to be applied on the face and not on the case-by-case analysis. One question here before you sit down is what's your response to the argument that we can look at the tariff order to help us review the deadline? Well, your honor, I think one of the guiding factors is looking at Kansas City v. FERC and cities of Batavia v. FERC. It's normal for a big market to have several orders, several, there are going to be several filings that effectuate putting a market into place and that in both the cities of Batavia and Kansas City v. FERC, the court decided the merits of the second order, even though it did imply terms that had been decided in the earlier matters. And I think, as I said, because the commission is once again at a 2-2 and like... Well, so wait, excuse me. So you agree with Mr. Fitzgerald that we don't need to struggle with this issue about what to do with the deadlock order and how to review it because we have the whole record. We have the commission's decision on the tariff. Absolutely, Your Honor. So you agree with it? Okay. Let me clarify. You're saying that it is appropriate for us to see, to look at the justifications in favor of the tariff to see whether the deadlock was sufficiently explained or reasoned? Yes, Your Honor. And as I understand that, I think that's everybody's position in terms of what to look at. All right. Any other questions? No. Thank you, Your Honor. Thank you. We'll take the matter under advisement.
judges: Wilkins, Rao, Tatel